The next case for argument is 25-1039, Atlas Global Technologies v. Lianzhou Technologies. Good morning. Good morning, and may it please the court. Mark Fleming on behalf of the appellants. I'll address two issues this morning, the flaws in the infringement case and the flaws in the damages case. First, with regard to induced infringement of the method claims, which is all but one of the asserted claims, there was no evidence that the appellants had knowledge of the infringement prior to the complaint. The plaintiff, Atlas, relies on certain letters and emails from June 2021. They don't identify any patents, they don't identify any accused products, and they don't even mention infringement. They just present an opportunity to license a portfolio of approximately 365 worldwide patents and applications, and Atlas' witness admitted there was no follow-up after these letters and emails. No one has identified any authority, suggesting that a generalized message like that, which under this court's precedent would not be enough to file a declaratory judgment action, doesn't even mention infringement, somehow creates knowledge of infringement for purposes of inducement. There's a second problem, which is that specific intent requires knowledge that the acts being encouraged actually infringe, and there's no evidence of that knowledge here even after the complaint. The product marketing materials that Atlas relies on reference features that are far broader than the patent claims. The testimony from the plaintiff's expert, Dr. Shoemake, was simply that the materials encourage people to buy and use the products, but there's no evidence that appellants knew that doing so would infringe these patents. I suspect Atlas' counsel is going to raise the waiver accusation, so I would like to just address that briefly. We clearly preserve the lack of intent issue as to pre-suit inducement. Neither Atlas nor the district court suggested otherwise, and the issue is the same. It's the failure of the marketing materials to show that the appellant companies intended to induce infringement. The district court decided that on pages 53 and 54 of the appendix. It was fully briefed in our Rule 50B motion, both as to pre-suit and post-suit inducement, and so this isn't a situation where the court doesn't have an opportunity, doesn't have the district court's views on the issue. The district court clearly addressed it. The court has the benefit of the district court's thinking. If you agree with us on the issue as to pre-suit inducement, this is just like Erickson versus TCL. There's no reason not to apply the ruling to post-suit inducement as well. If you disagree, however, that just means we need a new damages trial, because there's no way to break apart the verdict to distinguish between pre-suit damages and post-suit damages. With respect to – yes, Your Honor. As you're going to talk – returning to damages? I can talk to – yes, I can speak to that. I can also speak to direct infringement as well. I wanted to talk to you about the discounts. Yes, please. So I can appreciate what you're saying and concerns there about discounts and maybe that being inconsistent with a hypothetical negotiation at the time of the invention, but I'm worried that this was forfeited, and specifically, I don't see where it's raised in the Daubert motion, and this seems to me to be a fundamental framework issue. The expert said, I'm not going to include a discount for not having to bring the lawsuit, and I'm not going to include the early adopter discount. And so it was there in the expert's report. There was a reason for it, but that particular aspect of the expert's framework wasn't challenged in the Daubert. Am I missing something? Well, I wouldn't say you're missing something. You've correctly recited the procedural history. I think what I would say is we are not appealing a Daubert ruling. We're appealing a JAMAL ruling, the failure to grant JAMAL, that no reasonable jury could have failed to apply the discounts in this situation. And that is an avenue that the Daubert opinion itself, the Supreme Court's opinion in Daubert, recognizes. What about Versada? So in Versada, the argument, and this court quoted SAP's own brief and oral argument statements, noting that they were arguing that the expert's testimony should have been excluded. That's not our argument with respect to the discounts. We're not saying the district court should have excluded Mr. Weinstein's testimony on this point. The point is that even admitting that testimony, that testimony is not sufficient to support a jury verdict. And the Daubert opinion specifically says that is something that is possible. If expert testimony is admitted, it's not sufficient to support a verdict. The district court can still grant Rule 50. I just want to dig into that a little bit further.  So I think what I hear you saying is, I mean, you're saying there's no substantial evidence to support not giving these kinds of discounts. Correct. Okay. Then how could the expert, why wouldn't there be a Daubert motion that would say the expert can't say this, can't say that no discounts would be provided because there's no reliable basis for that opinion? I think it could have been possible to file a Daubert motion on that basis, but it is not required to do so in order to make and preserve a Rule 50 argument, that even assuming that the expert testimony is admissible, the jury, based on how it was instructed, based on the hypothetical negotiation, and based on his admissions on cross-examination, that had there been a negotiation in January 2019 at the date of first infringement, the appellants would have gotten these discounts. Based on that evidence and those admissions, no reasonable jury could have failed to apply the discounts. That is a JMOL argument. Can I ask you something else? I'm so sorry. Just one last question. Are these kinds of discounts, to your knowledge, common in patent licenses? Well, let's be clear. And I want to be careful because the licenses themselves that are in the record have been marked confidential by my opponent, and I don't want to—but your honors have them, and you have the briefs that discuss the terms. But I think I can say the licenses themselves do not have these discounts in them. These are discounts that were explained after the fact by the plaintiff and its expert as a way to try to explain why the licenses, which themselves have an effective rate that is far lower than the rate that was demanded in this case, could somehow be consistent with the demand that was being made. These were arguments, you know, I don't want to say ginned up, but they were arguments that were made by the plaintiff and Mr. Weinstein, their expert, in order to attempt to use licenses with a much lower effective rate to justify the higher rate they were demanding. There was some fact witness that testified about them, though, right? There was some fact witness that testified about these, or are you saying it's just the damages expert? No, no, no. Their corporate representative, Mr. Udell, testified about them, and they're in the record. There's no question that they're there. But if you look—and I can give you the sites, but you have them in the briefs. If you look at the face of those licenses, you won't see those discounts there anywhere. They're just not there. All they have is a number. And the explanation at trial, the assertion at trial, was that the reason that those folks paid the number they did was because they got the benefit of those discounts, and it was conceded that if there had been a negotiation between willing licensor and licensee in 2019, we would have gotten those discounts, too. You mentioned in passing a party re-answer to Judge Stoll jury instructions. Was there a—did you object to the jury instructions related to what we're talking about here on the discounts? On the contrary, we rely on the jury instructions because the jury instructions say that the damages, the reasonable royalty, is determined based on a hypothetical negotiation at the time of first infringement, which assumes that the parties were willing to enter an agreement, and this is on page 20, 25, and 26. Our argument now is precisely that the verdict that was reached cannot be viewed as supported by substantial evidence in light of those instructions and the evidence as it came in at trial with the damages— But doesn't the experts test—the expert support that jury verdict? Or expert? I don't think so, Judge Hughes, and that's because— Let's just say it does. Here's what's concerning me because I thought we had tried to clean up where this work was going to be done in Echo Factor, and it seems like it's not been cleaned up enough if you're arguing this. If a jury verdict, a no reasonable juror could find that the discounts wouldn't have been given, and the expert report says otherwise, then how is that expert theory a reliable theory that should have been admitted, shouldn't have been challenged at the Daubert stage? Because if—certainly if no reasonable juror could find that, then the expert's factual basis for his or her report has to be incorrect. So I don't think that last part is necessarily the case, and my support for that is the Daubert opinion from the Supreme Court, where the Supreme Court recognizes— Here's my problem. I understand what you're going to say. My problem is opinions come in at the Daubert stage that support the jury verdict, and then people come in and attack those opinions on a JMAL as no reasonable juror could have done this, found this fact, even though the expert's report is support for that, and that seems to me to be inconsistent. Once you let an expert report in, the jury is allowed to rely on it. If the jury relies on it, then it's sufficient evidence to support the jury verdict. I think the Supreme Court has said the opposite in both Daubert and in the Brook Group case. You can have expert testimony that comes in, that meets the reliability standard of the rules of evidence, that nonetheless is not sufficient to support the verdict in light of the record as a whole. And this is a case like that because we elicited on cross-examination of the expert admissions that at the hypothetical negotiation these discounts would have been given. I'm sorry. I didn't mean to cut off. No, that's fine. And so I would – I mean, the Brook Group case I think is important because it was issued by the Supreme Court the week before Daubert. And in Brook Group, the week before Daubert, the Supreme Court held over – it's an antitrust case, but held notwithstanding expert testimony that would have supported the prevailing party's view that no reasonable jury could have rendered a verdict in reliance on that testimony under Rule 50. And the Daubert opinion a week later recognizes that as a way that the district court can still grant judgment even if the expert testimony has come in and passes the methodological reliability. And that's what we're asking the court to do here, to determine whether the evidence, the record as a whole, is substantial enough that it would allow a reasonable jury to decide that at a hypothetical negotiation in 2019, the appellants wouldn't have gotten the pre-litigation and the early adopter discounts. There are a couple of apportionment problems as well that, with the court's permission, I would just address. These are Daubert arguments that are preserved, and there's no question about that. The district court should have excluded Mr. Weinstein's opinion because he failed to reliably apportion damages to the patented features. He developed what he believed was a royalty rate for each benefit that the patents provided, and then he averaged them all together. And that is unreliable because it means that a patent that covers three features could actually be worth less than a patent that covers only one. Because if you have a patent that covers A, B, and C, and they're worth $0.05, $0.03, and $0.01, you average them together, you get $0.03. But if you drop out the lower two, you have a patent that only covers one feature, all of a sudden that's worth more at $0.05. That is not reliable, and they have no response from a methodological point of view. Unless the court has questions at this point, I will reserve the balance of my time. Thank you. Thank you, Your Honor. May it please the court, Joe Greenstein for Appley Atlas Global Technologies. I'd like to address two points with respect to infringement, which I think may be not completely clear following the gray brief. First of all, there is an assertion at page 24 of the gray brief that because Atlas only asserted direct infringement of the 513 patent, that if this court were to reverse on direct infringement, then the whole liability verdict has to go away because one of the patents would have dropped out. I'm afraid my friends on the other side just honestly made a mistake reading the record. It is true that the 513 was the only patent for which Atlas asserted a direct infringement claim, but Atlas inserted an induced infringement claim for every claim of every single asserted patent, including the 513. That is clear from, among other places, the jury charge at Appendix 2013, which means if this court were to reverse on direct infringement, and of course we don't think you should, but if this court were to reverse on direct infringement, that does not take out the 513 patent because there would remain an induced infringement with respect to that patent. Don't you need, I'm sorry, maybe I'm misunderstanding. You need direct infringement to have induced infringement. I have to prove that somebody directly infringed, but I don't have to prove that the defendants directly infringed. So that record does establish that. Absolutely, Your Honor. The second point I would make is that there's a lot of discussion in the briefing about induced infringement. It's important to recognize that first, number one, TP-Link unquestionably waived the issue of induced infringement post-complaint. Their 50A motion was expressly directed to only pre-complaint inducement. With that context in mind, it's important to see that the pre-complaint inducement period that we're all arguing about here is six months long. Notice was provided in June of 2021, and this lawsuit was Do you want to address the sufficiency of that notice and the argument that opposing counsel made about how there was no specific patents mentioned or specific products mentioned? The notice letters that were sent to TP-Link USA included an identification of number one, that there was a patent portfolio that was owned by Neuracom, that is the Neuracom Wi-Fi 6 Essential Patent Portfolio that is now owned by Atlas and is being offered for licensing. Upon receipt of that letter, TP-Link knew, okay, Atlas is offering me the Neuracom patent portfolio. It's pretty easy to go look up which Neuracom patents those are. That being said, there was also instruction given to the jury as it relates to inducement as to willful blindness. That's at Appendix 2024. So when TP-Link received this letter, if they had any doubt about what patents were being discussed, if there was any vagary there, then TP-Link could have picked up the phone and called Atlas and said What number of patents are we talking about? Number of patents that are in the portfolio versus the number of patents that were ultimately asserted. It was between 100 and 150 in the portfolio. It depends on if you count foreign patents and all that good stuff. Five were asserted at trial, Your Honor. What about the difference there? Does that matter as we think about this issue? I don't think it does, Your Honor. They still had available to them information about the asserted patents. You think that sort of generic description should be sufficient? Especially on a willful blindness standard, because if they had any questions, there was a phone number, there was an e-mail address that they could have asked, and yet they They didn't have any. I mean, they knew you gave them information regarding a portfolio of including 150 patents. What should they have done? Called up and said, you don't really need 150. Which ones are you really going to assert? If they're right now claiming some ignorance as to what our intentions were, that's what they could have done, but they didn't do. And the jury was instructed on the issue of willful blindness. Again, these notice letters were sent to TP-Link, and TP-Link ignored them. What about the accused products allegation? No accused products were identified. The notice letters identified these patents as WIFI-6 standard essential. So any reasonable licensee, upon receiving that letter, would know, well, I'm offering WIFI-6 standard essential products. That means these patents are implicated. It's not some hard issue where, well, I don't know if my product is covered by this patent or not. These are standard essential patents. So, again, if there was any doubt, if TP-Link thought, well, maybe my patents aren't standard essential, I don't know, then call up Atlas and ask. But they were willfully blind to the mentions in the notice letter. And, again, I want to emphasize that this induced infringement issue covers six months of the case. Of the $37.5 million verdict, the pre-complaint induced infringement damages are about $500,000. That's what's being argued about right now, $500,000. In fact, if you add in their – We still have to consider it, but I hear you. I'm sorry, Your Honor. He said we still have to consider it, but I understand. Well, my point would be that – You know, the question is legally whether it's appropriate or not, right? My point, Your Honor, would be that if Your Honor were inclined to reverse on the issue of induced infringement, then vacate the damage as a reward and instruct the district court to enter a remittiture to get rid of these $500,000 of damages. But it's not worth retrying the entire case over because it's such a small issue in the grand scheme of things. My friends on the other side did mention, well, actually, even though we waived post-complaint inducement by not raising it as a 50A motion, this court should nevertheless consider it because the lower court did consider pre-complaint inducement. That's close enough, and because the lower court considered pre-complaint, apply that same ruling to post-complaint and reverse it. The problem with that line of thinking is that the lower court did not consider the very different issues that arise with respect to post-complaint induced infringement. Because whatever you want to say was the specific intent to encourage infringement with respect to pre-complaint infringement, the fact that they received a complaint that went through all the patents, that went through the standards, explained how the standards were implicated by all the patents, explained how they were infringing, and after receipt of that complaint and receipt of claim charts, they continued to sell the accused products and they continued to promote their use by their consumers, leads to an even stronger case of post-complaint induced infringement. And in fact, it's not me just saying that. Read their own briefs. Read their blue brief at page 54. Read their gray brief at page 24. In both of those instances, TP-Link itself, on the issue of specific intent to encourage infringement, draws a distinction between pre-complaint evidence and post-complaint evidence. All of which is to say this issue has been doubly waived. It was waived below when TP-Link didn't raise it as a 50A motion. And it's been waived on appeal because TP-Link has armed you with none of the facts or the law that you would need to consider to consider the difficult issue for them about whether or not there was post-complaint inducement. Because that issue is not the same as pre-complaint inducement and they admit it in their own briefs. Do you want to address the district court's ruling that the damages discount argument was, I guess, forfeited or waived by not being raised in the Daubert motion? That is a straightforward application of this court's opinion in versata, Your Honor. There's not some issue that there was insufficient evidence presented to the jury about discounts. There was plenty of evidence that the jury received about whether there were discounts or not, who should discount, so on and so forth. Their argument inherently is Mr. Weinstein misapplied the governing legal framework. He misapplied Georgia-Pacific, which we strongly disagree with, but that's their basic argument. That is an argument that belongs in a Daubert motion. It is an argument that if additional things happened during the trial that made it so it was more clear that there was no substantial evidence for this expert's testimony on that point. Those additional things being cross-examination. I mean, Daubert does say things like sometimes things are just the subject of cross-examination or that is because there was a jury trial instruction or what have you. I can't imagine what that would have been, Your Honor. His opinion was very clearly stated in his expert report. That expert report was the subject of a Daubert motion where they read it and they picked and chose what they wanted to file against. I don't think there was anything that my friends on the other side have identified from the trial that was some big surprise that he testified about outside the strictures of his expert report. I will also tell you that if you've ever tried a case in the Eastern District of Texas, woe be to you if you have an expert sponsor or an opinion that is outside their expert report. It's not a pretty thing. But in any event, the expert at trial confined his testimony to what was within the expert report. So I can't imagine what the argument would be that there was some surprise that prevented them from filing a timely Daubert. I guess what about the question that you can do both? That's what I was thinking of legally. Is there some reason why you wouldn't allow a party to be able to either choose Daubert or choose Rule 50? I'm just curious what your thought is on that. Well, I think this panel mentioned it earlier was we thought we'd worked it out in EcoFactor that if there are issues with an expert's analysis as it relates to these sorts of issues, challenge them at Daubert and give the other side. But give us an opportunity to fix our expert report. Give us an opportunity to understand what's in and what's out with respect to our expert so we can change our trial presentation. Instead, if we're allowed to proceed the way that TP-Link proposes to proceed, we've been sandbagged. We had no idea what the issue was with our expert, but apparently that doesn't matter. You could just revive it via Rule 50. I mean, at the end of the day, this is not a sufficiency of the evidence challenge. What evidence was insufficient? Was there insufficient evidence of discounts? That's not our burden. We don't have a burden to prove up discounts. They're plainly arguing that our expert's methodology was incorrect. That's something that's supposed to be dealt with via the gatekeeping function of Daubert, and it's what they defaulted on. I will further argue I'm arguing waiver so hard because they obviously waived, and that's the easiest way to deal with it. But the underlying argument is just completely meritless. The Georgia-Pacific standard dictates that we are supposed to assume that patents are invalid or not are, excuse me, are infringed and valid at the hypothetical negotiation. Their argument is we were mistreated by Mr. Weinstein by not conferring upon us some discount that ATLAS confers upon parties who don't go through with litigation and who don't challenge infringement and validity. Why on earth in the construct of a hypothetical negotiation should ATLAS have provided to TP-Link a discount to discourage them from challenging infringement and validity when in the hypothetical negotiation construct they're not allowed to challenge infringement and validity? And the concern, of course, is that what if everybody agrees to a 5% or 10% royalty, but then at litigation time you can say, well, those people got a discount because they didn't make us go all the way to a jury verdict, and that discount is 25%. So that's why we can go up another 25% or maybe I think in this case it was 50%. That's the concern on the framework, right, just to be clear. Two answers to that question. One, that's not uncommon, of course, because in every litigation case you show up to a mediation. The other side says your patents are trash. We're going to beat you at trial. We're not going to give you full dollar. And you say you compromise based on those issues and you accept lower than what your full dollar is. That happens in a lot of cases. So it's not uncommon, and it's actually the truth of how real-world negotiations occur. This is the opposite. This is saying that instead of relying on what the market indicates is the value, there is an inflation factor for litigation, even though the hypothetical negotiation is supposed to be based on the market rate. Well, the second thing I would mention is that this is not the situation where this was all just invented post hoc. There was testimony at trial. You can look, for example, at the Appendix 1290 to 1291, where Mr. Udell gives the example of one particular licensee. I won't name them in open court. And goes through the documentary evidence, not just his opinions, but the emails that were sent back and forth that actually laid out the discounts and said we're going to charge you this for this, this for that. This was not some post hoc rationalization of the numbers. The discounts were actually present in the negotiations, and that's just with respect to one licensee. He goes on throughout his testimony and explains how that's true for all of them. So this was not just some situation where he's coming up with these answers after the fact. I see that my time has expired. Are there any other questions from the panel? Thank you. Thank you. May I proceed, Your Honor? On the waiver point, in Brook Group v. Brown and Williamson, on page 242 of the opinion, the Supreme Court says, when an expert opinion is not supported by sufficient facts to validate it in the eyes of the law or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict. And then on the following page, because, as we have explained, this evidence is insufficient as a matter of law to support a finding of primary line injury under the Robinson-Patman Act, the expert testimony cannot sustain the jury's verdict. And this is exactly the kind of Rule 50 ruling that the Supreme Court the following week in Daubert recognized was still permissible even in the face of contrary expert testimony. Versada itself, this Court's decision in Versada, considered SAP's argument on the merits, it rejected it on the merits, that Versada didn't prove the quantum of its profits with reasonable probability. It considered that as a JAMAL argument, and it considered whether Versada's expert testimony, together with the rest of the record, was sufficient substantial evidence to support a verdict. That's on page 1266 of the opinion. So that's just what we're asking the Court to do here, because when we got to trial, Mr. Weinstein and their corporate representative, Mr. Udell, acknowledged, and this is page 1666 of the appendix, that had the appellants executed an agreement in 2019 before Atlas filed suit, we would have gotten all of the discounts. And in the face of those admissions and the instructions the jury was given about the hypothetical negotiation, as a matter of JAMAL, as a matter of law, no reasonable jury could have failed to apply the discounts. With respect to this point that pre-suit infringement only accounted for six months and only $500,000, I don't think that is even in their appellate brief. It's certainly not something that Mr. Weinstein put in front of the jury. Mr. Weinstein only gave a damages figure starting from the date of first infringement in 2019. There is no basis for this Court to break out, or for the district court, I would submit, to break out what the jury would have awarded in terms of damages had it confined itself to the post-complaint period. That just wasn't put before the jury. It hasn't been argued. We've heard it for the first time this morning. And then finally, the Court asked how many patents were mentioned in the notice, the supposed letters in June 2021. I won't read the answer out in open court because ATLAS has designated it confidential, but it's on page 5002 of the appendix. You can see the number. It is certainly far more than the five patents that have been asserted in this case. Unless the Court has further questions, we'd respectfully submit that the judgment should be reversed or vacated and remanded for a new trial. Thank you. We thank both sides. The case is submitted.